STORRIE v. FT. WORTH STOCKYARDS CO. et al.

(Court of Civil Appeals of Texas. Ft. Worth. Dec. 23, 1911.)

1. EVIDENCE (§ 471*)—OPINION EVIDENCE—CONCLUSION OF WITNESSES.

Plaintiff sued in the name of his firm to recover some $19,000 as a balance due from defendant for excavating and filling under a written contract, claiming that defendant conspired with the other members of the firm to settle in full for $9,000. Plaintiff in testifying was asked if there was any understanding who should pay for the dirt from a certain excavation which was put in defendant's fill, and stated that there was no such understanding, only that after the firm did the first work and the estimates were made, they estimated the amount of dirt that had been put in the fill and figured up the amount of excavation and the amount of dirt that was put in the fill, and, by comparing them, they saw that they were being paid for the dirt that was going into the fill from the excavation; that they got their information as to this from work they had done and that the estimate was made by the supervising engineer, and that they determined that they were being paid for the dirt going into the fill from such excavation because they knew how much dirt was going into the excavation. *Held,* that the evidence was argumentative and in the nature of conclusions.

[Ed. Note.—For other cases. see Evidence, Cent. Dig. §§ 2149–2185; Dec. Dig. § 471.*]

2. APPEAL AND ERROR (§ 1057*)—HARMLESS ERROR — EXCLUSION OF EVIDENCE — FACTS OTHERWISE ESTABLISHED.

Any error in excluding evidence was not prejudicial to appellant where he had the full benefit of all inferences legitimately deducible therefrom by the admission of other evidence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4194–4199; Dec. Dig. § 1057.*]

3. APPEAL AND ERROR (§ 1053*)—HARMLESS ERROR.

There was no reversible error, in an action in the name of a firm of which plaintiff was a member, to recover a certain sum, the balance claimed to be due from defendant for filling dirt, etc., under a written contract in which plaintiff claimed that defendant conspired with two other partners to settle the claim for $9,000 when $19,000 was due, in admitting the receipt for $9,000 executed by the other partners in full discharge of the contract with the firm, where the court charged that the receipt would not bind the firm if any sum was still due under the contract, and if so plaintiff could recover for such balance due.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4178–4184; Dec. Dig. § 1053.*]

4. PARTNERSHIP (§ 217*)—ACTION—ADMISSION OF EVIDENCE—RECEIPTS.

In an action in the name of a firm of which plaintiff was a member to recover a balance claimed to be due from defendant for filling dirt, etc., under a written contract, in which plaintiff claimed that defendant conspired with other partners to settle the indebtedness for a less sum than was due, the receipt in full given by the other partners was admissible in evidence to show partial payment under the contract.

[Ed. Note.—For other cases, see Partnership, Dec. Dig. § 217.*]

5. PARTNERSHIP (§ 217*) — ACTIONS — ADMISSION OF EVIDENCE.

In an action in the name of a firm of which plaintiff was a member to recover some $19,000, the balance claimed to be due from defendant for excavating and filling under a written contract, in which plaintiff claimed that defendant conspired with two other partners to settle in full for $9,000, evidence of defendant's general manager was admitted to the effect that defendant contracted with the A. Company for dirt coming from its excavations to be placed upon defendant's fill, and that the price of such dirt amounted to a certain sum which he paid to the A. Company, and which on final estimate was charged to plaintiff's firm. The contract between the firm and defendant did not provide for grading the dirt furnished in defendant's yards from the A. excavation. *Held,* in view of the allegation of conspiracy and the provisions of the contract, that the evidence of defendant's general manager was admissible to

show the good faith of the settlement made by defendant with the other partners.

[Ed. Note.—For other cases, see Partnership, Dec. Dig. § 217.*]

**6. APPEAL AND ERROR (§ 1053*)—HARMLESS ERROR—ADMISSION OF EVIDENCE CURED BY CHARGE.**

Any error in an action by a partner to recover a certain sum claimed as due from defendant, for excavating under a written contract on the ground that defendant conspired with the other partners in settling in full for a less sum, in admitting evidence of defendant's general manager that he did not conspire with the other partners to defraud plaintiff, was cured by a charge directing the jury to find for plaintiff, if they found that anything was due under the contract regardless of the bad faith of the other partners and defendant.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4178–4184; Dec. Dig. § 1053;* Trial, Cent. Dig. § 977.]

**7. CONTRACTS (§ 349*)—ACTIONS—ADMISSION OF EVIDENCE—ARBITRATION.**

In an action to recover a balance due under a written contract to excavate and fill dirt, evidence by defendant's general manager that plaintiff never called upon him to arbitrate a disputed question, coupled with long delay in suing, was admissible to support defendant's plea alleging a provision of the contract requiring arbitration.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 349.*]

**8. PARTNERSHIP (§ 217*)—ACTIONS—ADMISSION OF EVIDENCE.**

In an action by one member of a firm to recover a sum claimed as a balance due from defendant for excavating under a written contract, in which plaintiff claimed that defendant conspired with two other members of the firm to settle in full for a less amount than was due, the evidence of defendant's general manager that one of the other partners never claimed more money was due than was paid him under the contract with the firm, was admissible on the question of good faith in making the settlement, and to show that the other partners construed the contract as did defendant.

[Ed. Note.—For other cases, see Partnership, Dec. Dig. § 217.*]

**9. PARTNERSHIP (§ 206*)—DISMISSAL OF PARTNER—EFFECT.**

The dismissal as to a partner who was made a defendant in an action on behalf of the partnership terminated the suit of the partnership as such.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 382; Dec. Dig. § 206.*]

**10. PARTNERSHIP (§ 206*)—DISMISSAL AS TO PARTNER—EFFECT.**

Though the dismissal as to a partner who was made a defendant in an action on behalf of a firm by a partner to recover an alleged unpaid balance due the firm after a fraudulent settlement with two of the partners, terminated the suit as a partnership action, it was properly continued to determine whatever rights plaintiff might establish though he could only recover his aliquot share of any unpaid balance.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 382; Dec. Dig. § 206.*]

**11. PARTNERSHIP (§ 148*)—CLAIMS AGAINST THIRD PERSONS—SETTLEMENT.**

Members of a firm who received a certain sum in full settlement of the amount of an indebtedness due the firm, were precluded from afterwards asserting that more was due it, though the payment was in fact only a part of the sum actually due the firm.

[Ed. Note.—For other cases, see Partnership, Dec. Dig. § 148.*]

Appeal from District Court, Tarrant County; R. H. Buck, Judge.

Action by R. C. Storrie against the Ft. Worth Stockyards Company and another. From a judgment for defendants, plaintiff appeals. Affirmed.

Harris, Harris & Young, for appellant. Capps, Cantey, Hanger & Short, for appellees.

CONNER, C. J. R. C. Storrie, in the firm name of Storrie, Bavouset & Co., instituted this suit on the 2d day of August, 1906, against the Ft. Worth Stockyards Company and the Belt Line Railway Company, to recover the sum of $19,071.65 alleged to be the balance due for a large amount of grading, excavating, filling, etc., done by said firm for the defendants under a written contract. It was alleged that the firm of Storrie, Bavouset & Co. was composed of R. C. Storrie and J. Lang; that J. Bavouset whose name appeared in the firm was not a member of the partnership, but that his name was used with the permission of the plaintiff for the benefit of Lang. A copy of the contract was made an exhibit to the petition and provided for the payment on the part of the defendants:

For clearing and grubbing per acre.. $20.00
For earthwork per cubic yard...... .13½¢
For loose rock per cubic yard..... .36
For solid rock per cubic yard...... .72
For overhaul after 300 feet from haul ......................... .01¼¢ per cubic yard for each 100 feet of haul.

It was alleged that the plaintiffs had performed work in accordance with the contract, as estimated by the defendants' engineer in charge, of the value of $53,071.65; that said amount less the sum sued for had been paid to said firm under the terms of the contract; that soon after the completion of the work in September or October, 1902, the defendants had attempted a settlement with R. C. Storrie which had been declined; that later, in September, 1903, J. Lang and J. Bavouset without the consent of the plaintiff Storrie conspired with the defendants and entered into an agreement whereby the said J. Lang was to accept from said defendants in full satisfaction of said $19,071.65, the sum of $9,288.68; that this agreement between Lang, Bavouset, and the defendants was consummated, said Lang in the name of the said firm of Storrie, Bavouset & Co. signing a receipt purporting to be in full settlement of all demands against said defendants in favor of the firm. It was further alleged that the defendants pretended to have paid to Armour & Co.,

a corporation doing business in Tarrant county, the sum of $8,778.27, which sum said defendants improperly charged to the account of the plaintiff, Storrie, Bavouset & Co.; that said charge, as was claimed by the defendants, was the amount due to said Armour & Co. for certain dirt placed upon the fill of the defendants and taken from the premises of Armour & Co. by R. C. Storrie in a contract by Storrie individually with Armour & Co. to do certain excavations.

The defendants, Ft. Worth Stockyards Company and Belt Line Railway Company, answered, pleading that Lang had been made a party without his authority and specially, among other things, that the amount paid Armour & Co. for dirt was a just charge against the firm of Storrie, Bavouset & Co.; that said Lang and Bavouset so admitted and agreed that the sum of $9,288.68 was all that was due upon the contract and that this sum had been paid to them as a final balance on the 17th day of September, 1903. These defendants also pleaded over against the defendants J. Lang and Bavouset urging the good faith of the payment to them under an agreement that the amount paid constituted the full amount due said firm of Storrie, Bavouset & Co.; and they prayed, as against Lang and Bavouset, for judgment for any such amount as might be adjudged against them in this suit.

J. Bavouset appeared, and, among other things, pleaded a general denial to the plaintiff's petition and specially denied that he at any time ever entered into, or became a party to, any conspiracy with Lang or the other defendants to in any wise defraud the plaintiff Storrie and specially denied all allegations of fraud, and averred that the settlement made by himself and Lang was, so far as he knew, "a fair, just and correct settlement"; that said settlement was made by the authority of the majority of the members of said firm "in good faith and with no intent or purpose to in any wise defraud R. C. Storrie and that the settlement was within the scope of the authority of the majority of the members of the former firm or the partnership óf Storrie, Bavouset & Co."

It appears that upon a hearing of the defendants' motion therefor J. Lang was dismissed from the suit and that upon the submission of the case to the jury the trial resulted in a verdict for the defendants.

[1] The contract between Storrie, Bavouset & Co. and the Ft. Worth Stockyards and Belt Line Railway Company provided for monthly payments as the work progressed to be made upon estimates of the supervising engineer, one Robey, and appellant first complains of the exclusion of his testimony as set out in bill of exception No. 1. The material part of this bill as set out in appellant's brief is as follows: "Q. Was there any understanding as to who was to get paid for it?" (Meaning the dirt from the Armour excavation that was put on the stockyards fill.) To which question plaintiff Storrie, answered as follows: "A. There was no understanding as to who was to get paid for this Armour dirt, only that after we done our first work, and the estimates came along—the first work that was done, when our estimates came along—we looked up and estimated the amount of work that had been done, the amount of dirt that had been put in that fill, and the amount of work that had been done on the stockyards, and figuring up the amount of excavation and the amount of dirt that was put in that fill, and comparing it with our estimate, we saw that we were being paid for the dirt that was going into the stockyards fill. We got our information as to this from work that we had done and from the yardage that had been put out. That estimate, as I understand, was made by Mr. Robey. We arrived at that just exactly like a man would arrive at any other piece of work—he knows exactly what he is doing and he knows how much dirt he has moved, and he knows where he has put it—he knows where he has put every yard of it, and so it is accurate, and if we were 5,000 yards or 1,000 yards short, why we would know it at the time the estimate was made, whether we were being paid for it or not.

To this testimony as given by the plaintiff, Storrie, the defendants objected upon the ground that it was. nothing but an ex parte and a one-sided argument, and a conclusion of the worst legal form, and this objection was by the court sustained, and the plaintiffs then and there in open court excepted to the action of the court in excluding the testimony, etc.

[2] We think as appellee suggests that the testimony so offered was argumentative. Moreover, the record shows without dispute that the plaintiff, Storrie, after the first estimate made under the contract under consideration was absent in foreign lands; that he personally knew nothing of the particulars until his return after the completion of the work, and a consideration of the bill makes it evident that the fact he sought to thus show was that during the continuance of the work the dirt from Armour & Co. had been placed in the fill of the defendants and regularly estimated and paid for without deduction as the work progressed. This fact, however, otherwise appears from the record without dispute. John Currie, who had charge of appellant's "outfit and looked after Mr. Storrie's interests in the work" testified that "the first time I ever heard anything about this claim for this $8,000 was when I first saw the final estimate, and that was after the work had been completed and the dirt had been deposited on to the stockyards company's property." The superintending engineer, Robey, testified: "The reason this Armour dirt was not put in the estimate as the work progressed was be-

cause it is a very difficult proposition to tell where 60 or 80 wagons going around all the time have come from." It further appears without dispute that the amount of the Armour dirt was determined by the engineer, Robey, who was also superintending the work done by appellant, Storrie, for Armour & Co., by calculating the number of cubic yards taken from the Armour excavations and that the deduction made from the Storrie, Bavouset & Co. contract for this dirt was on the final estimate. The quantity of dirt thus estimated is not called in question, and we think it appears that appellant had the full benefit of all inferences to be legitimately deduced from the fact he evidently sought to show in the testimony set out in the bill of exception, and, therefore, that in no event should we sustain appellant's first assignment of error.

[3-4] Complaint in the third assignment is urged to the action of the court in admitting the receipt executed by Lang and Bavouset for $9,288.68 in full discharge of the Storrie, Bavouset & Co. contract. This was objected to on the ground that it did not appear to have been signed by any one who had authority on the part of the plaintiff, and, furthermore, because it appears that at the time of its acceptance by the defendants they had knowledge of the fact that it was not satisfactory to Storrie, Bavouset & Co., and that it was not a full payment of the true claim. It seems evident to us, however, that this assignment cannot be sustained for several reasons. In the first place the court, among other things, specifically instructed the jury that this receipt "would not be binding upon said firm of Storrie, Bavouset & Co. if in fact, if such be the case, there was still due from said defendant to said firm after and in addition to the payment evidenced by this receipt any sum of money for work done under the contract aforesaid. And if you find there was any such sum due said firm in addition to the $9,288.68 paid said J. Lang, then your verdict will be for such amount, if any, as you may find to be so due and unpaid." The court thus assumed in appellant's favor a want of authority on the part of Lang and Bavouset to bind the firm by the receipt of a less sum than was actually due, and further assumed in appellant's favor the only fact upon which he bases his proposition under this assignment, viz., that the receipt was "not admissible to prove the payment of the whole amount due." The receipt was at all events admissible, if not as evidence under the defendants' cross-plea against Lang and Bavouset, at least as evidencing a partial payment under the Storrie, Bavouset & Co. contract. The third assignment is, accordingly, overruled.

[5] In the fourth assignment complaint is made of the court's action in admitting the testimony of W. B. King as set out in bill of exception No. 7. This bill consists of a running series of questions, answers, and objection too voluminous to embody in the opinion. The evidence admitted and objected to, however, is to the effect that W. B. King, who was the general manager of the Ft. Worth Stockyards Company, had contracted with Armour & Co., at a certain price per cubic yard, for the dirt coming out of their excavations to be placed upon the fill of the stockyards company; that the amount of dirt so taken from the Armour excavations and placed upon said fill at the contract price amounted to the sum of $8,778.27 which he (King) paid to Armour & Co. and for which on final estimate the firm of Storrie, Bavouset & Co. had been charged. Appellant's material contention, in substance, is that the firm of Storrie, Bavouset & Co. was not chargeable with the dirt taken from the Armour excavation for the reason that under the contract with the stockyards company, Storrie, Bavouset & Co. were to "get 13½¢ per cubic yard for dirt excavated on defendants' premises and 13½¢ for dirt brought to line and grade in the fills on defendants' premises (whether said dirt came from the excavation on defendants' premises or from elsewhere) and 1½ cents per cubic yard for overhaul," etc. The question thus presented goes to the very foundation of the suit as instituted. We do not think it can be said, however, that as a matter of law the contract between the stockyards company and the firm of Storrie, Bavouset & Co. is to be construed in accordance with appellant's contention. It will be seen from the quotation hereinbefore made from the contract that Storrie, Bavouset & Co. were to receive "for earthwork per cubic yard 13½¢." The contract does not provide that the earth with which the fill was to be made must be taken from the premises of the stockyards company nor prohibit its placement by others, nor does it provide for any specified number of cubic yards which of right under the contract Storrie, Bavouset & Co. could put in on the fill, and it appears from other provisions in the contract that the clearing, grubbing, cutting, and fills were to be made as should be directed by the supervising engineer, the engineer being thus permitted to direct when and where fills were to be made and determine when they were completed. It seems also undisputed in the evidence that in the contract between appellant, Storrie, and Armour & Co., he was required under the direction of the same engineer to remove and deposit all excavated dirt from the Armour work at such place as should be directed by the engineer, appellant to receive a specified number of cents per cubic yard for the haul. Under this contract appellant in fact removed a large quantity of dirt from the Armour work and filled certain low places on the Armour & Co.'s premises without further charge than allowed for the excavation and hauling. It further appears undisputed that

during the progress of the stockyards works and while appellant was engaged in prosecuting the Armour work he was by said supervising engineer directed to remove the dirt which furnishes the basis of this controversy to specified places on the stockyards premises. While there is some contention in the appellant's brief that this loose or waste dirt from the premises of Armour & Co. belonged to appellant, the evidence fails to support any such view. Mr. Clark, Armour's representative with whom appellant contracted for the Armour work, testified that: "Under the contract it was Armour & Co.'s dirt. There was no agreement that Mr. Storrie was to have the dirt when excavated. Mr. Storrie was to put the dirt where we directed him." This is nowhere disputed in the testimony. Moreover, appellant, himself, testified: "No, the item I am claiming and suing for in this suit is not for hauling the Armour dirt on to the stockyards fill. I do not sue for that. I sue for the dirt after it was put there. I have been paid for the haul. I am suing for the labor that I put on that dirt that was put in the stockyards fill. I am not suing for hauling the dirt. I am suing for doing what Mr. King paid me 13½¢ for doing with the stockyards dirt. I had to do the same thing with the Armour dirt. I am not suing for the value of the dirt to the stockyards company." It seems to us that what has been said at least indicates that there was room for the contention of the stockyards company that it should be allowed in the settlement with Storrie, Bavouset & Co. for the value of the dirt for which in the monthly estimates Storrie, Bavouset & Co. had been credited. Suppose, in illustration, that before any work had been undertaken by Storrie, Bavouset & Co., the stockyards company from any or whatever source it could have purchased and provided for the deposit of any amount of dirt at designated places on the stockyards premises, what right of complaint would Storrie, Bavouset & Co. have had? Their contract with the stockyards company did not, as we have before observed, guarantee that they should be furnished with an opportunity to cut, or remove in any way any given number of cubic yards of dirt or other materials. Very probably, Storrie, Bavouset & Co. could have lawfully claimed and received the reasonable value of grading the Armour dirt as furnished upon the ground if in fact worked after its deposit, but the contract between Storrie, Bavouset & Co. and the stockyards company has no provision covering this phase of the evidence, nor has appellant any pleading that would authorize a recovery for this labor upon a quantum meruit. In view of appellant's specific charges of conspiracy and of fraud and of the evidence as we find it, we, therefore, conclude that the evidence of Mr. King objected to in the fourth assignment was admissible, if for no other purpose, for the purpose of show-

ing the good faith of the stockyards company's contention and of the settlement of the matter as made by Lang and Bavouset.

[6] The testimony of W. A. King complained of in the fifth assignment to the effect that he did not enter into a conspiracy of any kind with J. Lang and J. Bavouset to defraud R. C. Storrie, if objectionable for any reason, seems to have been rendered entirely harmless by the court's charge, which we have hereinbefore quoted in part, and which in effect directed the jury to find for appellant in event they found that anything was due under the contract regardless of the good or bad faith of King, Lang, and Bavouset, and the testimony complained of in the sixth, seventh, and eighth assignments of error likewise seems to be at least harmless.

[7] The testimony of King to the effect that neither R. C. Storrie nor other members of his firm had ever called upon him to arbitrate the question, coupled with the long delay in the institution of the suit, may be said to indicate acquiescence with the Lang and Bavouset settlement, but if not, the testimony was in support of defendants' unassailed special plea settting up a provision for arbitration in the contract.

[8] The testimony of the same witness to the effect that J. Lang never at any time claimed more money due than was paid him under the Storrie, Bavouset & Co. contract was admissible on the issue of good faith as well as to show that partners in equal authority with appellant, so far as the record shows, so construed the contract. The evidence of the same witness to the effect that the value of the work done by the plaintiff in leveling and bringing to line and grading the Armour dirt on the stockyards site was "about two or three hundred, perhaps three or four hundred, dollars at the outside to level it off," does not seem to be very material in any view of the case, but, whether so or not, we do not think we can sustain the special exception made to this testimony. It was: "We object to that because it does not appear from any evidence that anybody had the right to direct this dirt to be put on the grade in that it might have been a dump 40 feet high; as far as the evidence is concerned, it is a mere guess." It certainly appeared that the engineer had the right to direct the deposit of the dirt which direction was abserved by appellant and his foreman without protest, and whether placed in one place or another is immaterial to the present controversy.

Complaint is also made that the court erred in failing to charge the jury the legal effect of the contract sued upon, and in refusing to give special charges Nos. 1 and 2 presented by appellant. The special charges we think objectionable and from what we have already said of the contract, we think the court could not properly have charged the jury to the effect that it required a find-

ing for appellant, as appellant seems to insist should have been done.

[9-11] The thirteenth, fourteenth and fifteenth assignments of error certainly seem to be too general to require consideration, but in view of the zeal with which the cause has been presented, both orally and by brief, it may be appropriate to say that these assignments complain of the action of the court in overruling plaintiff's motion for a new trial on the ground that the verdict and judgment is contrary to the law and the evidence. Notwithstanding the general form of the assignments the record has been carefully examined and we think there is no merit in the contention. Besides other things hereinbefore stated we add in a general way that, aside from the effect to be given to the settlement made by Lang and Bavouset, when J. Lang was dismissed, and to which action on the part of the court appellant has assigned no error, the suit of the partnership as such terminated. See Frank v. Tatum, 87 Tex. 204, 25 S. W. 409. Notwithstanding this, however, in view of appellant's allegations of conspiracy and fraud, the suit was properly continued for the determination of whatever right appellant might establish, for the parties could not collusively deprive appellant of any right to which he was entitled under the contract. His right in no event, however, was to recover the entire amount due upon the contract for the benefit of the partnership, but only to recover such aliquot part of the unpaid sum, if any, as appellant was entitled to as a member of the firm. In so far as Lang and Bavouset were concerned, they by their settlement were undoubtedly precluded, and appellant, therefore, only lost by their fraud, if any, the amount that would have been coming to him under the terms of their partnership agreement, whatever that was. See Busby v. Rooks, 81 S. W. 1056,[1] South Fork Canal Co. v. Gordon, 6 Wall. 561, 18 L. Ed. 894.

On the whole we think all assignments of error should be overruled and the judgment affirmed.

[1] Reported in full in the Southwestern Reporter; reported as a memorandum decision without opinion in 72 Ark. 657.

